# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 1, 2012 Session

## IN RE: ZACHARIAS T. M., ET AL.

**Appeal from the Juvenile Court for Blount County**
**No. 20027      William T. Denton, Judge**

---

**No. E2012-00920-COA-R3-PT-FILED-NOVEMBER 13, 2012**

---

The State of Tennessee Department of Children's Services ("DCS") filed a petition in February of 2009 seeking to terminate the parental rights of Kimberly M. ("Mother")[1] to the minor children, Zacharias T.M., Isaiah K.M.,[2] Ashley M.M., Chelsea M.M., Sierra C.M., and Brittany N.M. ("the Children").[3]  After a trial, the Juvenile Court terminated the parental rights of Mother to the Children after finding that grounds for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and (g)(3) and Tenn. Code Ann. § 36-1-102(1)(A)(ii) had been proven by clear and convincing evidence, and that clear and convincing evidence had been shown that it was in the Children's best interest for Mother's parental rights to be terminated. Mother appeals to this Court.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

---

[1] The petition also sought to terminate the parental rights of the legal or putative fathers, Kevin M., Robert H., Robert S., and Avery H.  The Juvenile Court terminated the rights of these four fathers to Ashley M.M., Chelsea M.M., Sierra C.M., and Brittany N.M.  None of these fathers are involved in this appeal. See footnote 2 in this Opinion for additional details.

[2] The two oldest children, Zacharias T.M. and Isaiah K.M., were removed from Mother's custody at the same time as their four younger half-siblings.  They spent some time in DCS custody and then exited custody to live with an uncle who resides in another state.  The Juvenile Court did not terminate parental rights with regard to either Zacharias T.M. or Isaiah K.M., and these two children are not involved in this appeal.

[3] When we refer to "the Children" in this Opinion we refer only to Ashley M.M., Chelsea M.M., Sierra C.M., and Brittany N.M., not to Zacharias T.M. or Isaiah K.M.  At times within this Opinion we refer to the children individually by their first names.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Kimberly M.

Robert E. Cooper, Jr., Attorney General and Reporter; and Joshua Davis Baker, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

**Background**

The Children were removed from Mother's custody and taken into State custody in August of 2007 and have been in foster care continuously since that time. The Juvenile Court adjudicated the Children dependent and neglected in January of 2008. On February 12, 2009, DCS filed the petition seeking to terminate Mother's parental rights to the Children.

The case proceeded to trial in March of 2012. Mother did not appear at the trial. At the beginning of the trial, Mother's counsel moved to continue because Mother had not arrived. The Juvenile Court[4] denied the motion. After testimony had begun, Mother's counsel received a message from Mother stating that Mother was in a hospital emergency room where she had been taken by ambulance because she was having chest pains. Mother did not tell her attorney the name of the hospital. Because Mother resided in Blount County at that time, efforts were made to contact the two local hospitals, UT Medical Center and Blount Memorial Hospital, and it was discovered that Mother was not a patient at either of those facilities. Mother's counsel then renewed her motion to continue. The Juvenile Court denied the motion but stated that if Mother provided some documentary proof that she had been in the hospital with a medical emergency during the hearing the Juvenile Court would entertain a motion to set aside. Mother never provided any such proof.

Anna Lahrs, a case manager with Smoky Mountains Children Homes, testified at trial that she has been working on a project in which contract case managers work with DCS. Ms. Lahrs has been the case manager for the Children since October of 2011.

Ms. Lahrs explained that the Children were removed from Mother's custody due to lack of supervision, environmental neglect, and educational neglect. Chelsea, who was around four years old at the time, was found approximately three-fourths of a mile from Mother's house in a neighbor's house. Because Chelsea did not know where she lived, the

---

[4]The case was tried before a Magistrate, and the Juvenile Court subsequently ratified and confirmed the Magistrate's findings of fact and conclusions of law. For purposes of simplicity only, we refer in this Opinion to the trial court as the "Juvenile Court."

neighbor called the police. Mother did not contact the police until Chelsea had been missing for two hours. Child Protective Services went to Mother's home after this incident. Ms. Lahrs testified:

> When CPS went to the home, all the family members were sleeping in one room in the living room on mattresses on the floor and the trailer was a burned-out trailer.
>
> There was lots of trash everywhere and the house smelled of cat urine and was infested with flies.… The two school-aged children in the home were not registered for school and there had been previous instances of truancy.

Several permanency plans were developed for the Children. The first permanency plan was developed in October of 2007, and Mother was present for the development of that plan. The first permanency plan required Mother to maintain appropriate housing for at least six months, obtain a legal source of income, obtain and maintain stable transportation, resolve her legal issues and not incur any new charges, attend parenting classes, and complete a mental health assessment. Ms. Lahrs testified that Mother did complete some of these tasks.

When asked about what DCS did to assist Mother, Ms. Lahrs testified:

> The case manager at the time did numerous home visits at the home. The home that she was actually in at the time of removal, she did not live in after that. She was evicted shortly after the removal of the children from that home.
>
> So then she had a period of time where she lived with her parents and during that time, the Department helped her with applications for subsidized housing and gave her resources for subsidized housing and the resource that also has homemaker services.
>
> And then the Department also supervised visitations in her home to help address any safety hazards.… The Department helped supervised [sic] visitation and then they also submitted a request for therapeutic visitation through Florence Crittenton who provided therapeutic visitation and help with transportation and also information on safety and nutrition.

DCS also assisted Mother in obtaining a mental health assessment.

Ms. Lahrs testified that the second permanency plan, created in May of 2008, contained all of the same requirements as the first permanency plan, and DCS also asked Mother to provide proof of employment within two weeks because Mother claimed she had employment but had no documentation of that fact. Mother was not able to maintain that employment.

A third permanency plan, created in August of 2008, contained the same requirements as the previous plans, and DCS also asked Mother to provide a new car insurance card. Mother did provide DCS with a temporary insurance card.

Ms. Lahrs explained that when the Children came into State custody in August of 2007, Mother was not employed. Mother later became employed. DCS obtained a check stub for September 30, 2007 for Mother's employment with Laws Brickmill Market. This is the only check stub that DCS has for Mother from this employer. Mother began working for Cargo Oil on December 6, 2007. Mother's employment with Cargo Oil ended in February of 2008. Mother then was unemployed until April of 2008 when she worked half a shift at Weigels. Mother was rehired at Cargo Oil in December of 2008. Cargo Oil closed in November of 2009, and Mother's employment with them ended at that time. DCS has one pay stub from the Knoxville Airport Hilton for Mother from July of 2010. DCS is not aware of any period of time when Mother was physically incapable of working and also is not aware of any period of time when Mother was hospitalized or involved in an accident and unable to work. During the period of time from November of 2008 through February of 2009, Mother was not in jail. Ms. Lahrs testified that since February of 2009 Mother has not been able to consistently maintain either housing or employment.

When asked about a trailer Mother had lived in since the Children came into State custody, Ms. Lahrs testified:

She did not have an appropriate amount of beds in the home.

She was working on getting beds before we could look at placing the kids there and also there was [sic] some safety issues with some with [sic] railing and safety latches and also some hazards to exits being blocked that needed to be corrected.

And she did work on correcting those, but then she got evicted from the home…. In that home [Mother] was asked if she needed beds and her response was that they were coming and that she had already had bunk beds. She was just waiting to get them out of storage…. When the case manager had

-4-

gone out there and noticed some of those problems, [Mother] was told how she could fix them in order for them to be safe for the children.

And she did so. She fixed the safety latches and the railing was also repaired…. I think there was a crib and some other things that were blocking exits and those were removed.

Ms. Lahrs testified that Mother lived in this trailer from December of 2007 until June of 2008 and stated: "that was the longest she had lived anywhere…. [A]nd then once she had fixed the safety concerns, she got evicted." Ms. Lahrs further stated: "she didn't have stable employment … [a]nd she also didn't have car insurance or a transportation plan." Mother did obtain a van, but she did not maintain insurance on it. Ms. Lahrs stated: "[Mother] never had a problem obtaining a house or obtaining a job or obtaining transportation. Her problem was maintaining it."

At the time of trial Mother lived in a two bedroom apartment with a man. Mother and the man she is living with have not cooperated with DCS to allow DCS to ascertain if this man is an appropriate person to be around the Children.

Ms. Lahrs testified that Mother has not demonstrated the type of parenting that would indicate that Mother has corrected the lack of supervision that led to the removal of the Children from her custody. Ms. Lahrs testified that during supervised visitations: "it takes more than just [Mother]. We have to have two other supervisors or she lets the children walk outside, she would - - it's just - - it's hard for her to keep her eyes on four children at one time."

Ms. Lahrs testified that she has not seen any evidence that would make her believe that Mother has corrected the conditions of her housing and her parenting abilities in order to ensure the safety of the Children. Ms. Lahrs believes that the Children would be at risk of being dependent and neglected if returned to Mother. Ms. Lahrs testified:

The children have been in care for over four years now and it would be in their best interest to obtain permanency and that cannot be done with parents' rights in tact [sic] because that's been the plan from when the kids came in in August and that has not - - the original reasons for custody have not been remedied.

Ms. Lahrs testified that the Children do not ask about Mother. When Ms. Lahrs initiated a conversation about Mother, only one of the Children expressed an interest in visiting Mother.

Since the Children were taken into State custody, Mother has had approximately 75 visits with them. Ms. Lahrs testified that "for the most part" Mother visited the Children consistently. Mother's last visit prior to the trial in March of 2012, was in January of 2012. Three visits were scheduled between that January visit and the time of trial, but Mother failed to show up at these visits. When asked if Mother provided an explanation for missing the visits, Ms. Lahrs testified:

> She - - the one in February she did. She called the day before. No. She called the morning of and said that she was sick.
>
> And then the next one she had called and said that she forgot when it was and it was actually that day and she said that she couldn't make it.
>
> And I offered to pick her up because she said she didn't have a ride and that's why she couldn't make it. And she said she didn't have food for the kids and I said, "Well, that's okay. We can do that."
>
> And then she said, "Well, I just need to have it another day." And so I scheduled it for this past Wednesday and she didn't show and I haven't heard from her.

In October of 2010, Mother was exercising unsupervised visitation with the Children until an incident occurred. Ms. Lahrs explained:

> There was in incident in October of 2010 where the mother - - her behaviors were erratic and it was when she was dropping off the kids to the foster parent.
>
> And her behaviors become so out of control that the police were called. And she had some medication that she would not give to the children and so they believe that she was under the influence of something.
>
> She was subsequently arrested for that and that's when unsupervised visitation ended.

As a result of the October 2010 incident, Mother was charged with child abuse and neglect. Mother pled guilty to attempted child abuse. Mother was charged with driving under the influence in September of 2011, and she pled guilty to this charge.

Kim Spenser[5], a CASA worker assigned to Mother and the Children since February of 2008, testified at trial. Ms. Spenser testified:

> In my very, very first meeting with [Mother], the issue of her employment came up and she said that she was employed at Cargo.
>
> And I asked how many hours a week she was working. She would not reply. And so I asked her several more times to try to get her to tell me how many hours she was working and subsequently found out that she had been let go and she wouldn't let us know that.

There were several other instances when Mother reported that she was employed, but Ms. Spenser would discover when she called the employer that Mother actually was not employed.

Ms. Spenser was asked about Mother's response to questions from DCS about whether Mother needed assistance, and Ms. Spenser stated:

> That she did not need help, that she would find it on her own, she had it taken care of, she was moving into a place.
>
> Frequently, she would say, "I found a place." And I'd say, "Where are you living?" "I found a place." And I'd say, "What's the address?" "Well, I don't have it with me."
>
> "Well, will you call me with it?" "Yes." And then she wouldn't. And several times when I would try to get the name of the landlord, she would say I don't have it with me.
>
> And I might even be in her house and she'd say she didn't have it with her and couldn't provide me with the name or telephone number of anyone that I could contact to verify that she was looking for a place or found a place to live…. She always would say my brothers [sic] going to come and do that, I've got a bed coming, I've got this. She always said she had it handled.

---

[5]Ms. Spenser's last name is spelled as "Spenser" at some places in the record and as "Spencer" in others. For purposes of simplicity only we utilize the spelling that appears in the Magistrate's Final Judgment of Termination of Parental Rights and Full Guardianship, which was ratified and confirmed by the Juvenile Court on May 4, 2012 *nunc pro tunc* to April 10, 2012.

Ms. Spenser testified that Mother flatly refused offers of assistance and to Ms. Spenser's knowledge never accepted an offer of help.

Ms. Spenser testified about the incident that occurred in October of 2010 that led to the end of Mother's unsupervised visitation with the Children stating:

[Mother] had a weekend visit with [the Children] and when they - - when she got [the Children], [the Children] and her and a friend of hers were going over to another friends [sic] house.

And [Mother] was acting very erratically and when they got to the other friends [sic] house, [Mother] pulled her pants down in the middle of the yard and mooned everybody in sight and that's when the police were called and arrested her.

The youngest - - I believe it was Sierra, had been to the doctor that day and had gotten an antibiotic. And when the police came and arrested [Mother], she would not give up that drug, that antibiotic to go - - because the kids were going back to their foster mother and she was going to jail.

And that was one of the things that led to her being charged with abuse of children because she wouldn't give up that antibiotic. So the child went the weekend without having that drug.

When asked if Mother had explained why she would not give up the medication, Ms. Spenser stated: "That she had paid for it and therefore she was going to maintain control of it."

Ms. Spenser testified about the time period when Mother was having unsupervised visitations with the Children stating:

I usually try to stop by the house a couple times each weekend just to check on how things were going. In my observation [Mother] was not managing [the Children] well.

I stopped by once and I can give you the date. October the 9th, 2010. Three of the girls; Chelsea, Brittany, and Ashley were in the tub playing. And the tub water was running and the water - - the tub was completely full.

So every time the girls would move, the water was flowing out onto the floor. And [Mother] did not seem the least bit concerned that the bathroom

-8-

was being flooded and she didn't tell the girls to turn off the water or anything. She just let them continue on.

At the same time, Sierra was laying on a mattress in the master bedroom covered up with just - - it was a bare mattress. There was no pillow case on the pillow and no sheets on the bed and the blanket that she was covered up with had dirt on it.

And she said she didn't feel well. So I felt her and she felt a little bit warm and so I told [Mother] - - I said, "What's going on with her?" And she said she doesn't feel well - - was the response that she made.

And I said, "Why is she laying on a bed with no covers? Why are there no sheets or anything on this bed?" And none of the beds had any sheets on them and she said, "They're being washed."

And I said, "Did you just strip the beds this morning?" And she said no. So I don't know how long they had been washed, but at least over night.

So I told her that the girls needed to not be playing in a tub with the water splashing out on the floor and that Sierra needed to be in a bed with clean sheets and that she needed to be monitoring her obviously.

When I stopped back by on Sunday the 10th, there were sheets on the bed at that point in time, but there was [sic] dirty dishes everywhere and the floor was really really sticky. Something had been spilt on the floor.

There was a gallon of milk open on the living room floor just sitting in the living room and I told [Mother] there's a gallon of milk in the living room and she went and got it and put it in the refrigerator.

And when I came in the house, Chelsea was sitting on one of the beds and she had a container of Cool Whip and she was eating the container of Cool Whip with her fingers.

So the children were always left to do just whatever. I would frequently see them walking around with a bag of Doritos and a Mountain Dew or she would give them energy drinks.

We had several discussions about, you know, the appropriateness of energy drinks for small children, but she would let them have energy drinks.

I never saw her have a constructive bonding time with the children. They were always pinging off the walls and she was just unsure of what to do.

Ms. Spenser testified that the DCS workers talked to Mother about the nutritional content of food:

Many many times. And there were times when she was having them in her house that she would cook food. She might make spaghetti or she might cook corn and she would cook some basic things.

But the vast majority of the visits it was always pizza, chips, ice cream and soda. Soda's always a part. In fact, one of my notes talks about Chelsea walking around with a plate that had a pop tart and - - let me get all the details - - Cheetos, a pop tart, and a Zinger. There was no nutritional food at that visit at all.

Photographs of a trailer where Mother lived in December of 2008 were introduced at trial. Ms. Spenser described one of the photographs stating: "This is a table in the corner of the kitchen that has items belonging to all six of the children as well as incense and candles on it.... [Mother] described it as a shrine to her children." When Mother was asked about the purpose of the items on the table, she refused to answer those questions. Ms. Spenser testified that there was a pentagram drawn on the floor near the table pictured in the photograph. Mother was questioned about the pentagram and during subsequent visits, Ms. Spenser observed a place-mat thumb-tacked over the pentagram so the case workers could not see it.

Ms. Spenser also testified about a photograph depicting papers scotch-taped to a wall stating:

These are - - and on top of each piece of paper is a lock of hair from her kids. And these are - - I can't remember if these are actual birth certificate [sic] or if they're doctors [sic] visits notices.

But they're medical documents of some sort. I cannot remember exactly what each of them was. And there are other things taped to the wall where they had doctors [sic] visits and whatnot.

When asked about the papers taped to the wall, Mother acknowledged that they were locks of the Children's hair, but refused to discuss it any further. Mother was evicted from this trailer around the end of 2010, and to Ms. Spenser's knowledge Mother has not had a residence of her own since that time.

Ms. Spenser was asked if she thought that the two trailers that Mother had lived in since the Children came into State custody would have been appropriate for the Children, and she responded:

The level of clutter was astronomical. In her living room on Watson, she had three TVs stacked on top of each other in a very precarious manner that where a bigger one would be stacked on top of a smaller one.

So that if you - - I would be concerned that a child would pull them off on top of themselves. One of the - - two of the arm chairs in the living room were covered with the boy's clothing set out in a display-type fashion where they were laying up on the chairs and laid out for display purposes.

In the boys [sic] bedroom there were magazines that were fanned out like you might see in a doctor's office laying half on top of each other, but they went all the way around the room.

She appears to me to be someone who's very much into - - okay. Here's a very good example. If the children - - let's say we were at a visit out and the children drank a coke, or the children ate a McDonalds [sic] burger, she wouldn't allow you to throw away the paper or the can from that meal.

And it wasn't like she was recycling aluminum cans. They showed up on her table as a shrine. Anything the children touched; an empty pizza box, half-eaten hamburgers, ice cream cones that were put into a ziploc bag, and put in her purse and taken home.

She is compulsive about keeping stuff. And anyone that's ever been around her at one of these visits, she always carries bags with her.

And in those bags will be every documentation, every piece of documentation that is important to her. I've seen her go through - - pull out a pile of papers that are rubber banded together and go through them to look for an insurance card or to look for a pay stub or look for some piece of documentation.

She carried all that with her everywhere she went. And her house very much reflected that level of clutter and filth.

Ms. Spenser was asked how Mother related to the Children and she testified:

Mostly in a reactionary way. They would want something and she would go and get it. The children because of the high-sugar content - - and most of the snacks that she provided to them were not what we would consider nutritional snacks.

And so they would be pinging off the walls and she would be trying to respond to them.… And frequently there would be three of us there besides [Mother] and the children. There would be three others. Somebody from DCS, somebody from Omni, and then myself. And I mean there were always more than just her there.

And we frequently - - we would say do you realize that this child is doing this, you know, do you see that that's maybe not an appropriate thing to do.

And if we said something to her, she would try to go and remedy it. But frequently she wouldn't. She would walk that way, but she would never actually stop the behavior.

Ms. Spenser also testified:

[Mother] talked to herself a lot. She would carry on - - the commentary that we all have inside our heads - - I need to do this or I'm on my way to do that, she verbalized all of that.

And so she would walk around the house talking to herself out loud, a conversation that we would normally consider as something that would go on inside of our head.

Ms. Spenser testified that the therapeutic visitation provider worked with Mother to try to improve Mother's parenting skills, but Ms. Spenser never saw Mother make any improvement in her parenting skills. When asked if she thought the Children would be safe in Mother's care, Ms. Spenser stated: "Absolutely not.… [I]n my observation, I have

-12-

never seen a change in her behavior. Her behavior's just as erratic toward her children today as it was when they were taken into custody four-and-a-half years ago."

After the trial, the Magistrate filed a Final Judgment of Termination of Parental Rights and Full Guardianship on April 10, 2012 containing detailed findings of fact and conclusions of law, which provides, in pertinent part:

> The mother called her attorney and the Guardian Ad Litem after the hearing had commenced and reported that she had been taken to the hospital by ambulance that morning due to experiencing chest pains. The Court set the matter for further hearing on April 9, 2012 and advised counsel for the mother that the mother, through counsel, should present evidence to document her illness and trip to the hospital to opposing counsel by April 3, 2012. The Court advised that consideration would be given to setting the judgment of [sic] aside if good cause were shown. The mother also failed to present any proof to document her trip to the hospital on March 30, 2012 and further failed to appear at the hearing on April 9, 2012. The Court, therefore, declined to reconsider the judgment announced during the hearing on March 20, 2012 which is set forth in this order.
>
> The Court, after hearing testimony from DCS Case Manager, Anna Lahrs, and CASA Advocate, Kim Spenser, and considering the entire record and exhibits introduced herein, the Court finds by clear and convincing evidence the following:
>
> * * *
>
> **PARTIES**
>
> 1. Petitioner is the current custodian of the children. The Blount County Juvenile Court adjudicated the children dependent and neglected on January 7, 2008 after issuing an emergency protective custody order placing the children in state's custody on August 30, 2007. The children have been in foster care continuously since the Juvenile Court's protective custody order.
>
> * * *
>
> **GROUNDS FOR TERMINATION**

The Court specifically finds that the department did not prove the ground of abandonment for failure to support with regards to the mother, but does find that the department has proven the remaining grounds contained in its petition by clear and convincing evidence, including:

**1. Abandonment - Failure to Provide a Suitable Home as to the Mother:**

The Court finds that the Petitioner has proven by clear and convincing evidence that:

a. The mother has failed to correct the conditions that led to the removal and establish a suitable home for the child.

b. DCS has made reasonable efforts to assist the mother to establish a suitable home.

c. The mother has a lengthy criminal history and has incurred new criminal charges since the child came into DCS custody.

d. At times, the mother made efforts to correct the conditions that led to the removal of the children, but failed to make any lasting changes that would permit the return of the children to the home. Currently, the mother does not have appropriate housing for the children, is unable to manage the care and supervision of the children to such a degree that the children would be at risk of being dependent and neglected if they were returned to her care, and was recently convicted and sentenced on a criminal charge of driving under the influence. These facts, especially the fact that she has not been able to make any significant, lasting changes that would permit her to provide a suitable home in the more than four (4) years that the children have been in the custody of the department of children's services, demonstrate a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date.

e. These facts meet the statutory requirements for this Court to find that the Department has established the necessary facts by clear and convincing evidence to meet the requirements of Tenn. Code Ann. §§ 36-1-102 (l)(A)(ii) and -113 (g)(1).

**2. Persistence of Conditions as to the Mother:**
The Court finds that the Petitioner has proven by clear and convincing evidence that:

a. In August 2007, the children were removed from the legal custody of the mother because she lacked suitable housing for the children, was not

providing adequate supervision of the children, and was not ensuring that the older siblings of the four children at issue here attended school.

b.　The conditions that led to the removal still persist and/or other conditions in the home exist that, in all probability, would lead to further neglect or abuse of the children.

c.　There is little chance that those conditions will be remedied soon so that the children can be safely returned to the home.

d.　DCS has made reasonable efforts to assist the mother in remedying the conditions that led to the removal, but avail [sic]. These reasonable efforts included: assisting the mother in obtaining a mental health assessment, arranging for and supervising regular visitation with the children, providing for the mother to attend parenting classes, providing therapeutic visitation to assist the mother with supervision issues, evaluating the various residences where the mother lived and informing her of any changes that needed to be made to ensure that the home itself was appropriate for the children, and offering assistance with transportation for appointments or visitation when the mother indicated that transportation was a barrier. The mother regularly refused the offers of assistance and always indicated that she didn't need any help in remedying the conditions that led to the removal of the children.

e.　These facts meet the statutory requirements for this Court to find that the Department has established the necessary facts by clear and convincing evidence to meet the requirements of Tenn. Code Ann. § 36-1-113 (g)(3).

\* \* \*

## BEST INTEREST

The Court finds, with the concurrence of the Guardian Ad Litem, that it is in the best interest of the child for the rights of the Mother, Respondent/Legal Father, and Respondent/Putative Fathers be terminated based upon the following factual findings:

\* \* \*

[T]he mother has failed to make any lasting change to her circumstances that would allow her to adequately care for the children despite having more than four (4) years to make such change. The mother has maintained regular contact with the children through visitation, but the children do not regularly ask to see the mother and usually are concerned with making sure that she is doing well

-15-

rather than spending time enjoying a parent-child relationship. The mother is incapable at this time or in the near future in refraining from bizarre behaviors which impede her ability to promote a healthy parent-child relationship. The mother is also incapable of providing adequate supervision that would ensure the safety of the children.

The Juvenile Court entered an order ratifying and confirming the Magistrate's findings of fact and conclusions of law on May 4, 2012 *nunc pro tunc* to April 10, 2012. Mother appeals to this Court.

## Discussion

Although not stated exactly as such, Mother raises three issues on appeal: 1) whether the Juvenile Court erred in refusing to grant Mother a continuance; 2) whether the Juvenile Court erred in finding that grounds had been proven to terminate Mother's parental rights to the Children; and, 3) whether the Juvenile Court erred in finding that it was in the Children's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97

-16-

(Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Juvenile Court erred in failing to grant Mother a continuance. As this Court stated in *State of Tennessee Dep't of Children's Servs. v. V.N.*: "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *State of Tennessee Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008) (quoting *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997) (citations omitted)).

As pertinent to this issue, Tenn. Code Ann. § 36-1-124 provides:

**36-1-124. Contested terminations of parental rights and adoptions – Appeals – Expedited schedule.** – (a) In all cases where the termination of parental rights or adoption of a child is contested by any person or agency, the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given

priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

\* \* \*

(c) It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36-1-124 (2010).

Although Mother left a message telling her attorney that she was in a hospital emergency room and attempts were made to verify that Mother was in the hospital, Mother's attorney and the Juvenile Court were unable to verify Mother's excuse for her failure to appear at trial. The Juvenile Court even went so far as to tell Mother's attorney that if Mother would provide some documentary proof to substantiate her claimed excuse, the Juvenile Court would entertain a motion to set aside the judgment. Mother never provided any proof substantiating her excuse for failing to appear at trial.

In her brief on appeal, Mother argues that the Juvenile Court "denied her the opportunity to be heard" when it refused to grant the continuance. We disagree. Mother had the opportunity to appear at trial, and she clearly was aware of the date and time as she contacted her attorney to leave a message about why she was not there. Furthermore, the Juvenile Court gave Mother ample opportunity to provide proof of a valid excuse for not appearing at trial and specifically stated that it would entertain a motion to set aside the judgment if Mother provided a valid and substantiated excuse. Mother failed to provide any such proof. Given our General Assembly's clear directive regarding expediting contested parental termination proceedings and Mother's failure to provide any proof in support of her claimed excuse for failing to appear at trial, we are unable to conclude that the Juvenile Court abused its discretion when it denied Mother a continuance.

We next consider whether the Juvenile Court erred in finding that grounds had been proven to terminate Mother's parental rights to the Children. The Juvenile Court found that grounds had been proven by clear and convincing evidence to terminate Mother's

parental rights under Tenn. Code Ann. § 36-1-113(g)(1); § 36-1-113(g)(3); and 36-1-102(1)(A)(ii).  In pertinent part, Tenn. Code Ann. § 36-1-113 provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

* * *

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
      (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
      (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
      (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; ….

Tenn. Code Ann. § 36-1-113(g) (2010).

As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

      (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed

child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parents(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2010).

As quoted above, the Juvenile Court made detailed and specific findings with regard to this issue including, among others, the findings that Mother had failed to provide a suitable home for the Children, that the conditions which led to the Children coming into State custody persisted, and that DCS had made reasonable efforts to assist Mother. The evidence in the record on appeal, as already discussed in this Opinion, does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that grounds were proven to terminate Mother's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1), § 36-1-113(g)(3), and § 36-1-102(1)(A)(ii).

Finally, we consider whether the Juvenile Court erred in finding that it was in the Children's best interest for Mother's parental rights to be terminated. With regard to this issue, the Juvenile Court specifically found:

The Court finds, with the concurrence of the Guardian Ad Litem, that it is in the best interest of the child for the rights of the Mother, Respondent/Legal Father, and Respondent/Putative Fathers be terminated based upon the following factual findings:

* * *

[T]he mother has failed to make any lasting change to her circumstances that would allow her to adequately care for the children despite having more than

four (4) years to make such change. The mother has maintained regular contact with the children through visitation, but the children do not regularly ask to see the mother and usually are concerned with making sure that she is doing well rather than spending time enjoying a parent-child relationship. The mother is incapable at this time or in the near future in refraining from bizarre behaviors which impede her ability to promote a healthy parent-child relationship. The mother is also incapable of providing adequate supervision that would ensure the safety of the children.

The evidence in the record on appeal does not preponderate against these findings made by clear and convincing evidence that it is in the Children's best interest for Mother's parental rights to be terminated.

Given all of the above, we find and hold that the Juvenile Court did not err in terminating Mother's parental rights to the Children. We affirm the Juvenile Court's judgment entered May 4, 2012 *nunc pro tunc* to April 10, 2012 terminating Mother's parental rights to the Children.

### Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Kimberly M., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE