IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 28, 2014 Session

IN RE SHANEEQUE M.[1]

**Appeal from the Circuit Court for Blount County**
**No. E-24985      Tammy M. Harrington, Judge**

---

**No. E2014-00795-COA-R3-PT-FILED-NOVEMBER 20, 2014**

---

This is a parental rights termination appeal brought by the mother. The trial court found clear and convincing evidence to support the grounds for termination and clear and convincing evidence that termination was in the child's best interest. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Kimberly M.

Robert E. Cooper, Jr., Attorney General and Reporter, and Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Wade Jenkins, Knoxville, Tennessee, Guardian ad Litem.

**OPINION**

**I. BACKGROUND**

Shaneeque R.M.M. ("the Child") was born on February 21, 2013. She entered the custody of the Department of Children's Services ("DCS") on February 28, 2013, seven days

---

[1]To protect the identity of children in parental rights termination cases, initials are used instead of last names.

after her birth. DCS has an extensive history of involvement with the Child's mother, Kimberly M. ("Mother"), who has had her parental rights to four other minor children terminated. *In Re Zacharias T.M., et al.,* 403 S.W.3d 212 (Tenn. Ct. App. 2012). Two other children were placed with an out-of-state relative.

The Child at issue in this appeal was removed from Mother's custody due to environmental concerns, lack of a car seat, and lack of a crib. In April 2013, following a parole violation, Mother was incarcerated. On April 25, 2013, DCS filed a petition to terminate Mother's parental rights. It was stipulated by the parties that Mother was incarcerated from April 5 to April 24, 2013.

The trial in this matter was held on January 27, 2014. Mother acknowledged that she has given birth to seven children and indicated that she was again pregnant.[2] She named Reginald J. R. ("Father") as the Child's father and indicated he is also the father of any child or children resulting from her current pregnancy. Previously, Mother misidentified the Child's father as "Reggie Robinson." According to Mother, that was the name Father gave her, he is a big man, and she had no right to question him or to ask to see his license. Father voluntarily surrendered his parental rights to the Child on April 4, 2013, and is not a party to this appeal. Initially, Mother would not acknowledge whether Father used illegal drugs, but then admitted he had used illegal drugs in her presence. She denied currently using illegal drugs, but admitted using such drugs in the past. She acknowledged using cocaine before she became pregnant with the Child. However, she tested positive for cocaine in a hair follicle collected in December 2013.

In addition to the April 2013 arrest for a probation violation,[3] Mother noted that she was again incarcerated in August 2013. According to Mother, she had previously plead guilty to attempted child abuse.[4] and for driving under the influence in 2011.[5]

---

[2]At a prior hearing, Mother stated she was expecting quadruplets.

[3]Complaint states Mother willfully failed to pay the fine and costs, failed to appear in court as ordered, and failed to comply with rules of her probation.

[4]Complaint states Mother arrived at a friend's home "intoxicated carrying a large bottle of rum (1/3 consumed) . . . . argumentative, spitting and engaging in an altercation with [the friend]'s 15 yr. old son." The friend was keeping Mother's four daughters for weekend visitation. According to the complaint, Mother "knowingly arrived at the residence under the influence, refused to administer medical aid to her child and intended to take custody of aforementioned children for the weekend in this neglectful state."

[5]She was arrested for DUI in September 2011 in Blount County.

Mother testified that she has anxiety, nerve problems, and a number of physical ailments and receives a disability check for physical and mental issues. Although prescribed Depakote for depression in 2008, Mother did not refill the prescription, indicating she does not feel she has any psychological problems. In 2011, Mother was involuntarily admitted to Lakeshore Hospital. DCS requested that Mother have a psychological examination, but she did not complete it prior to the trial. She claimed to have two psychological exams scheduled for after the trial.

The home Mother resides in is owned by her stepfather, Allen B. ("Stepfather"). According to Mother, in the past, Stepfather has assaulted her five times, including "two attempts to kill." She further indicated Stepfather has subjected her to physical and sexual abuse, dating back to 1987. Mother claimed Stepfather makes threats regarding black people and racially charged comments about the Child, who is biracial. She had Stepfather served with an order of protection, but at the time of trial, he apparently still lived with Mother in the house. Based on the most recent order of protection of record, Mother was authorized to retrieve her belongings from the home, rather than live there. Mother, however, claimed that the order had been amended before the trial to allow her to stay in the house.

At the time the Child was born, Mother had no car seat or crib, and planned for the Child to sleep on a "normal" mattress on a waterbed frame. She acknowledged that presently her home was not safe enough for the Child, but claimed she was in the process of making it safer. Mother admitted that her living conditions have been a concern for DCS over the years.

In her trial testimony, Mother claimed that she planned to obtain employment, but also stated she did not have the ability to work. Her sole income is the disability check. After deductions and garnishments for child support and court fees, Mother is left with $326 per month. Mother asserted this amount is sufficient income for her to provide a home and for the Child's needs, but then testified to $400 in monthly expenses.

Despite acknowledging she did not visit the Child for a four and a half month period from the time the Child was removed until July 2013, Mother asserted she has a bond with the Child. She admitted that she had spent a total of 24 hours with the Child since the infant's removal.

Laura Hamilton, a DCS case manager, testified that she had visited Mother's residence. Ms. Hamilton noted that just weeks before the trial, the home was cluttered with piles of clothes, some of which were piled on top of space heaters. She described a pathway to walk inside the home and observed that she could see only 25% of the floor due to the clutter. Additionally, she noted there was a wood-burning fireplace without a safety gate,

cabinets without doors, and outlets without covers. She further noted the roof appeared ready to cave in. After subsequent follow up visits, Ms. Hamilton opined that there has been no change in conditions in the home other than Mother obtaining a smoke detector. As recently as the Friday before the trial, Ms. Hamilton determined Mother had made no improvements.

In her testimony at trial, Ms. Hamilton related that Mother spent a total of eight hours with the Child since October 1, 2013. Mother had one visit in October, two visits in November, zero in December, and one in January. Ms. Hamilton admitted there would have been an additional visit but for an illness the Child was experiencing. With the exception of a visit in January, the Child cried throughout each of the visits. According to Ms. Hamilton, the Child has bonded with her foster parents and is a happy child. A sibling is in the same foster home with her; three of her other siblings have been adopted by the mother of the Child's current foster mother.

Ms. Hamilton reported that DCS offered services to Mother, including parenting classes in the home and a psychological exam. Mother subsequently missed two scheduled appointments for the psychological exam. She started the parenting classes just prior to trial. According to DCS, difficulty was had keeping in contact with Mother as she had moved and changed her phone number.

Jessie McCoy, a case manager employed by Smokey Mountain Children's Home, was assigned to the Child's case in March 2013. Ms. McCoy noted that she became aware of Mother through experiences with the other children in state custody. She observed that Mother's current behavior is consistent with her prior actions with her older children. Ms. McCoy noted that during visitation, the Child stayed upset and did not seem to know Mother.

Delsa Spence, a DCS case manager, related that she visited the home and spoke with Stepfather. He indicated on one occasion that Mother did not live there, but admitted on another occasion that she did reside there. According to Ms. Spence, Mother initially had regular visitation with the Child. However, between visits with the Child on April 2, 2013, and September 11, 2013, Mother disappeared and provided no explanation for her absence.[6] Ms. Spence observed that the Child has bonded with the foster family and they desire to adopt the Child. Mother informed Ms. Spence that she would get a mental health assessment but never provided any documentation.

On April 17, 2014, the trial court terminated the parental rights of Mother on the grounds of wanton disregard and mental incompetence. The court further found that termination of Mother's parental rights was in the best interest of the Child. The trial court

---

[6]Mother's incarceration began on April 5, 2013.

observed, inter alia, the following:

> THE COURT: . . . The respondent was in jail part or all of four months just before this petition was filed. There was a stipulation that [Mother] was incarcerated from April the 5th, 2013, to April 24th, 2013. This petition was filed April the 25th.
>
> As stated for number two, before going to jail she was engaged in conduct that exhibits a wanton disregard for the [C]hild's welfare.
>
> . . . DCS involvement started in large part due to her previous termination -- involuntary termination of four children and then her bringing the [C]hild home . . . . [S]he did not have a crib for the [C]hild. . . . [T]he [C]hild was sleeping on a waterbed with a mattress for a regular bed and that there were spaces. [Mother] said it was an inch; the other testimony was larger than that, but that it was not appropriate. There were clothes piled on the bed, et cetera, and that was one of the main triggering events that brought the [C]hild into custody.
>
> So that happened before her incarceration. She brought the [C]hild home to this residence on Clover Hill where she resides with [Stepfather]. And I do find that what has happened in relation to [Stepfather] and the Order of Protection and the facts contained therein . . . are relevant because a great deal of the information or a lot of the information that was in that petition predates the birth of th[e C]hild and were conditions that were in place that she knew about before she brought th[e C]hild home. Further, that the residence was not -- not only was her fellow occupant not appropriate but the home was not in an appropriate condition.
>
> . . . [P]rior to her incarceration she testified that at the time this action was initiated she did not know -- or that [Father] had given her the [false] name, that she did not know him, or that she did not have his full legal name, and she explained why she didn't. I understand what she said, but that she remained with him, stating that the last time he assaulted her domestically was April the 2nd, 2013, which was prior to her incarceration.
>
> And I think that it is relevant that her testimony here today was that she still even after that April the 2nd, 2013, domestic assault engaged in some form of relationship with [Father], including that if she is pregnant, that he is the father of the child -- children. I'm not sure how to term the next pregnancy. But that

relations continued even after he was abusive and she knew that.

So I find that all of those things were in place as well as that she had a history based upon her previous -- and I'm not going to give this as much weight as the issues with [Stepfather] and [Father] and the home and the living conditions, but she had lost previous children. And part of the issues that she's had throughout the years has been mental health issues. That was part of the recommendation when [the Child] was taken into custody, and she did not follow through with mental health treatment or a full assessment February, March and April 10 2013 prior to her going to jail.

\* \* \*

So the history of the issue of mental health treatment has been persistent well before the filing of this petition April 25th, 2013. And given the ramifications that have happened in [Mother]'s life due to the mental health issues and the recommendations for mental health treatment, I find that is a fact that I can find, and I am going to consider that's something that happened prior to her incarceration in April.

I find all of those facts by clear and convincing evidence, and I find that based upon all of those facts, the history, and the record as a whole, that the State has met its burden as to Ground One for wanton disregard by clear and convincing evidence.

Ground Two, mental incompetence. I've touched upon that as part of the wanton disregard, but I'm going to state for the record -- because a court transcript sometimes reads very flat -- [Mother]'s demeanor here today was at times odd, was at times unstable. She was nonresponsive at times to the questions. She was off-task. She brought up irrelevant facts. She couldn't follow the court's instructions from everything to the volume of her responses, and she couldn't conform her behavior. . . .

[Mother], I'm going to state for the purpose of the record -- and you know this -- you're very intelligent, and that was borne out by your ability to remember dates, et cetera. But it was also very apparent at times you did not want to tell this court the truth. That was very specific in relation to [S]tepfather and other issues. . . . [Y]our appearance here today was not stable. . . .

\* \* \*

-6-

We do not have testimony from a mental health expert. We do not have testimony from a psychologist. I do not have a full psychological evaluation before the court, in part because [Mother] didn't follow through. . . .

* * *

. . . I think that you do care. I think, though, and I'm going to find, that based upon all the proof by clear and convincing evidence you care but that you have issues in your life mentally and a mental condition that obviously keeps you from being able to parent, that keeps you from being able to get your life together in such a manner that you provide a safe environment for th[e C]hild. And I think that the record bears that out.

So I do find that the State has met its burden as far as Ground Two as to mental incompetence.

* * *

In the written final judgment of termination, the court provided:

[The Child] is bonded with her foster mother and siblings and changing caretakers at this stage would be detrimental. She was subjected to neglect as a direct result of [ M]other's actions, which placed her in the home of an abuser. The pattern is clear with [Mother] such that she will return to an abusive situation as she likely has known no other life. However, [the Child] should not be sentenced to the same fate and deserves safety, stability and permanency. [Mother] has shown a wanton disregard for the welfare of th[e C]hild by her actions and inactions. She is clearly incompetent to parent th[e C]hild and there is little chance the condition can be improved so that the [C]hild could safely be placed with her in the foreseeable future. She continues her relationships with abusive individuals to the point of possibly becoming pregnant again by such an individual. She brought this infant home from the hospital to [ S]tepfather's home whom she swore under oath had not only physically abused her, but had sexually abused her. . . .

* * *

The Court finds by clear and convincing evidence that [Mother]'s conduct prior to her incarceration, including residing with a man she testified had physically and sexually abused her for an elongated period of time; remaining

in a romantic relationship with someone she testified had physically abused her; and her failure to seek any assistance or treatment for her mental health issues exhibited a wanton disregard for [the C]hild's welfare.

The Court finds by clear and convincing evidence that [Mother] is incompetent to provide adequately for the further care and supervision of the [C]hild because of a mental condition that so impairs the ability to parent. Furthermore, the Court finds by clear and convincing evidence that there is little chance that the condition can be improved to such an extent that the [C]hild can be placed safely with [Mother] in the foreseeable future.

Mother filed a timely notice of appeal.

## II.  ISSUES

We restate the issues raised in this appeal as follows:

a.  Whether clear and convincing evidence supports the trial court's finding of wanton disregard.

b.   Whether clear and convincing evidence supports the trial court's determination that Mother's mental condition impairs her ability to parent the Child.

c.  Whether termination of Mother's parental rights is in the Child's best interest.

d.  Whether the trial court erred in admitting certain exhibits.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and

final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36–1–113(I)(1)). " '[F]ew consequences of judicial action are so grave as the severance of natural family ties." ' *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36–1–113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear*

*and convincing evidence that supports all the elements of the termination claim. State Dep't of Children's Servs. v. Mims, 285 S.W.3d [435,] 447–48 [(Tenn. Ct. App. 2008)]; In re Giorgianna H., 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); In re S.M., 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. In re Angela E., 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; In re Adoption of A.M.H., 215 S.W.3d at 809.*

*In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010) (emphasis added).

Regarding the credibility of trial witnesses, the reviewing court should give considerable deference to the trial court's findings. *McCaleb v. Saturn,* 910 S.W.2d 412, 415 (Tenn. 1995); *see Sonet v. Unknown Father of J.D.H.,* 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990) (stating that "the findings of the trial court as to the credibility of the witnesses are entitled to great weight").

## IV. DISCUSSION

### A. WANTON DISREGARD

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

**36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child . . . by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interest of the child.

\* \* \*

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tenn. Code Ann. §§ 36-1-113(a)-(g)(1). Relevant to the facts of this case, Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides that abandonment means that

the parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, *or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.*

Tenn. Code Ann. § 36-l-102(1)(A)(iv) (emphasis added). The statute does not expressly define the type of conduct that is deemed to exhibit "wanton disregard" for a child's welfare. We have repeatedly held, however, that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867–68 (Tenn. Ct. App. 2005). A parent's incarceration serves as a triggering mechanism to allow a court to take a close look at a child's situation to determine whether the parental behavior is part of a broader conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child. *Id.*, at 866. Trial courts may look to a parent's conduct prior to the four months before a parent's incarceration in determining whether a parent has exhibited wanton disregard under Tennessee Code Annotated section 36-1-102(1)(A)(iv). *Id.*, at 870-871.

In this case, Mother argues that, based upon the plain language of Tennessee Code Annotated section 36-1-102(1)(A)(iv), the trial court was limited to review of her conduct

from the time the Child was conceived, presumably in the summer of 2012, to the time of Mother's incarceration in April of 2013. Mother contends any conduct that occurred prior to the Child's conception or after Mother's incarceration ended is irrelevant. Mother further asserts there is no clear and convincing evidence in the record to establish her wanton disregard of the Child during the period at issue.

The ground of wanton disregard does not require that the conduct referred to occur within the four month window prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). *See also State Dept. of Children's Services v. V.N.*, 279 S.W.3d 306, 320 (Tenn. Ct. App.2008) (wanton disregard shown by fact that defendant had been incarcerated nineteen previous times). Tennessee Code Annotated section 36-l-102(l)(A)(iv) reflects the "commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.*, 182 S.W.3d at 866 (citing James G. Dwyer, "A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships," 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)).

The record before us exhibits clear and convincing evidence of wanton disregard. As noted by the trial court:

> [Mother] stipulated that she was incarcerated within the four months prior to the filing of this petition and [Mother] testified that she was incarcerated again in August 2013 for a violation of probation. The Court finds by clear and convincing evidence that [Mother]'s conduct prior to her incarceration, including residing with a man she testified had physically and sexually abused her for an elongated period of time; remaining in a romantic relationship with someone she testified had physically abused her; and her failure to seek any assistance of treatment for her mental health issues exhibited a wanton disregard for [the C]hild's welfare.

Bringing the Child into the home of a man who has been physically and sexually abusive in the past in addition to maintaining a relationship with another person who is physically abusive and uses illegal drugs shows wanton disregard for the Child. Wanton disregard is also demonstrated by the fact that Mother has failed to seek any treatment for the psychological issues she demonstrated at trial.

## B. MENTAL INCOMPETENCE

The other ground raised for termination is mental incompetence, Tennessee Code Annotated section 36-1-113(g)(8):

> The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-l-113(g)(8)(B). Mother argues that a finding of mental incompetence requires expert testimony or a psychological examination.

No expert testimony was provided in this matter and the trial court did not have the benefit of a psychological exam due to the fact that Mother failed to participate in an evaluation. However, expert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required. *See In re Alicia K. A.*, No. E2012-02614-COA-R3-PT, 2013 WL 3422973 (Tenn. Ct. App. July 8, 2013); *In re B.L.S.C.*, No. M2008-02301-COA-R3-PT, 2009 WL 971286*8 (Tenn. Ct. App. April 7, 2009).

Clear and convincing evidence exists to support the trial court's findings. Mother has had all of her children removed from her care and placed in state custody. Evidence exists to establish that Mother suffers from a mental disability that has rendered her incapable of caring for all her children for a significant period of years, yet she refuses to follow though with recommendations for treatment. She has demonstrated a pattern of living with abusive men, using illegal drugs, and abusing alcohol. During the trial, Mother was "yelling" at the bench and her answers to questioning were often unresponsive; other replies were untruthful and evasive. Accordingly, we find ample evidence in the record to establish that Mother suffers from mental incompetence. Clear and convincing evidence supports the trial court's determination.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting a statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Child. In making this determination,

we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36–1–113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional

status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36–1–113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36–1–101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The proof clearly reveals that termination of Mother's parental rights was in the Child's best interest. Mother's home is not safe for the Child, she has avoided undergoing a psychological exam, and it appears that she continues to reside with a man she has testified has physically and sexually abused her. *See* Tenn. Code Ann. § 36-1-113(i)(1),(2),(6), and (7). The Child has bonded with her foster parents and is happy. Tenn. Code Ann. § 36-l-113(i)(5). For a period of four and a half months, Mother did not visit the Child and has only seen her daughter a total of 24 hours since her birth. Thus, Mother did not maintain regular visitation or have a meaningful relationship with the Child. Tenn. Code Ann. § 36-1-113(i)(3) and (4).

## C. EVIDENTIARY ISSUES

Mother contends the trial court erred in admitting orders from the juvenile court into the record, specifically admitting the Preliminary Hearing Order and Adjudicatory Order based on statutory law forbidding disclosure of juvenile court case information. It appears that Mother did not object or argue at trial on this basis and we therefore find the issue to be waived. Furthermore, we conclude the trial court did not rely upon the evidence. Additionally, Mother asserts that Rule 404 of the Tennessee Rules of Evidence would bar admission at trial of an arrest warrant admitted into evidence. We find that Mother stipulated the arrest warrants were admissible to the extent they show what crime the conviction was for. Accordingly, any error, if any, in admitting the evidence was harmless.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this case is remanded for such further proceedings as may be necessary.  Costs of the appeal are assessed to the appellant, Kimberly M.

_____
JOHN W. McCLARTY, JUDGE