IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 3, 2014 Session

IN RE GRAYSON H.

Appeal from the Juvenile Court for Knox County
No. 19372      Timothy E. Irwin, Judge

No. E2013-01881-COA-R3-PT-FILED-APRIL 14, 2014

This is a termination of parental rights case, focusing on Grayson H., the minor child ("Child") of Steven H. ("Father") and Jessica L. ("Mother"). The Child was taken into protective custody by the Tennessee Department of Children's Services ("DCS") on March 9, 2012, following Father's incarceration and Mother's subsequent arrest. Mother's parental rights to the Child were terminated in a separate proceeding. On October 17, 2012, DCS filed a petition to terminate the parental rights of Father. Following a bench trial held on July 11, 2013, the trial court granted the petition upon its finding, by clear and convincing evidence, that (1) Father had abandoned the Child by showing wanton disregard for the Child's welfare and (2) the conditions causing the removal of the Child into protective custody persisted. The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest. Father has appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Bradley D. Sherman, Knoxville, Tennessee, for the appellant, Steven H.

Robert E. Cooper, Jr., Attorney General and Reporter, and Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I. Factual and Procedural Background

The Child had been removed from parental care and placed in protective custody on two separate occasions, the first occurring one week following the Child's birth in July 2010. DCS caseworker Marquita Andrew testified that the Child first came into protective custody after both he and Mother tested positive for oxycodone at the Child's birth. Upon the first removal, Father told the caseworker that he could not care for the Child, and the Child was placed with the maternal grandparents. Father participated in the creation of a permanency plan and subsequently complied with the requirements of that plan. Upon DCS's motion, the trial court ordered the Child placed with Father for a trial home visit on November 19, 2010. As the trial home visit proved successful, the trial court subsequently awarded custody to Father on February 28, 2011. In its order awarding custody to Father, the trial court stipulated that Mother was to enjoy only supervised visitation and was not to be permitted overnight contact with the Child.

One year after Father had obtained custody of the Child, Father was arrested on November 30, 2011, and charged with aggravated kidnapping and robbery in relation to an incident that occurred on August 26, 2011. Mother was present at the time of the arrest, and according to DCS personnel, law enforcement officers permitted Mother to take custody of the Child. Father did not inform the officers that Mother was not allowed unsupervised visitation. He testified at trial that Mother had left the scene of his arrest before the officers transported him to jail and that he believed a family friend had taken care of the Child.

Father remained incarcerated from November 30, 2011, through at least March 28, 2012, without notifying DCS of the situation. DCS became aware of Father's incarceration when Mother was arrested on March 8, 2012, and charged with possession of a schedule two drug, as well as driving on a revoked license. At the time of Mother's arrest, law enforcement was called to investigate because Mother had parked in a stranger's driveway, believing it to be the driveway of Father's home, where she apparently had been living. According to Ms. Andrew, Mother was disoriented and admitted to police officers that she had taken Xanax. The officers searched Mother's car and found methadone and morphine. Mother also ingested pills, later identified as Soma tablets, during the process of the arrest. Law enforcement officers contacted DCS because the Child was in Mother's car at the time of Mother's arrest. Although the Child's maternal grandfather cared for the Child immediately following Mother's arrest, he informed DCS that the maternal grandparents were no longer in a position to care for the Child for an extended period of time. DCS placed the Child in a non-kinship foster home and petitioned the trial court for an emergency

-2-

protective custody order, which the court granted on March 14, 2012, *nunc pro tunc* to March 9, 2012.

On May 7, 2012, Father pled guilty to one count each of robbery, *see* Tenn. Code Ann. § 39-13-401 (2010), and aggravated assault, *see* Tenn. Code Ann. § 39-13-102 (Supp. 2011), both Class C felonies. Ms. Andrew testified that DCS records showed that Father had been temporarily released from confinement on March 28, 2012. Father testified that criminal court records erroneously showed a March 28, 2012 release and that he actually was not temporarily released until the hearing at which he pled guilty on May 7, 2012. It is undisputed that Father spoke with Ms. Andrew only once in May 2012 regarding the custody situation with the Child, although Father asserted at trial that he attempted to call DCS personnel several times.

Certified copies of the judgments entered against Father by the Knox County Criminal Court, admitted as exhibits during the termination proceedings, demonstrate that on July 27, 2012, Father was sentenced as a multiple offender. His sentence included two eight-year periods of incarceration to be served concurrently and at a minimum of 35% before he would become eligible for parole. The Court of Criminal Appeals subsequently affirmed Father's sentence, and a slip copy of that decision was also admitted as an exhibit during the termination proceedings. *See State v. Steven [H.]*, No. E2012-01597-CCA-R3-CD, 2013 WL 593424 at *5 (Tenn. Crim. App. Feb. 14, 2013) (concluding that the trial court did not err by denying Father a sentence of community corrections). Father testified at trial in the instant action that he would be eligible for parole eighteen months following the termination proceedings, or specifically in January 2015.

Following a hearing conducted on August 23, 2012, the trial court adjudicated the Child as dependent and neglected as to both parents and entered a written order to that effect on October 1, 2012, *nunc pro tunc* to August 23, 2012. In the same order, the court denied a petition for custody filed by the maternal grandparents. At the time of parental rights termination proceedings, the Child was in a pre-adoptive home and had been situated there since May 2012, two months after he was taken into protective custody. Ms. Andrew testified that the Child was well adjusted in the pre-adoptive home and that he was identifying the foster parents' other children, including two biological children, one adopted child, and one other foster child, as his brothers and sisters.

On October 17, 2012, DCS filed its petition seeking termination of Father's parental rights on the statutory grounds of abandonment by wanton disregard for the welfare of the Child, *see* Tenn. Code Ann. §§ 36-1-102(1)(A)(iv) (2010), 36-1-113(g)(1) (Supp. 2013), and persistence of conditions that led to the Child's removal into protective custody, *see* Tenn. Code Ann. § 36-1-113(g)(3). DCS sought termination of Mother's parental rights in a

separate petition, which the trial court granted prior to trial in the instant action. In December 2012, Father wrote and transmitted to the trial court a letter requesting appointment of counsel. On December 12, 2012, the court appointed attorney Gregory Bennett to represent Father, who had been represented by other appointed counsel during the dependency and neglect proceedings. Attorney Heidi Wegryn was appointed and remained the Child's guardian *ad litem* ("GAL") throughout both the dependency and neglect and parental rights termination proceedings.

Trial was continued twice by the court, once in March 2013 and once in April 2013, due to problems with transportation for Father from his prison facility in West Tennessee to court in Knoxville. When trial was reset for July 11, 2013, the trial court concomitantly issued an order of transportation for Father. Father declined the transportation, however, and requested through his counsel that the court order the transportation stopped. The court granted Father permission to participate telephonically with his counsel present in the courtroom. At the beginning of trial, Father telephonically requested another continuance, stating that he was without legal materials he had researched because those materials had been lost when his transportation to court was stopped midway and he was returned to prison. The trial court denied Father's request and proceeded with trial.

During DCS counsel's direct examination of the first witness, Father interrupted telephonically to state that he was not comfortable continuing the trial with his appointed counsel's representation. The trial court permitted Father to explain his concern and allowed him time to consult with Attorney Bennett in open court. The court explained to Father, however, that if it relieved Mr. Bennett of his responsibility to represent Father, the court would not appoint Father new trial counsel. Father asked the court if it would continue the trial to allow Father an opportunity to retain other counsel. The trial court treated Father's request as a second oral motion for continuance. Upon consideration of the case's procedural history, the court denied the second oral motion as well. Father elected to proceed with Mr. Bennett acting as his counsel.

At the close of trial, the court found, by clear and convincing evidence, that (1) Father had abandoned the Child by showing wanton disregard for the Child's welfare and (2) the conditions causing the removal of the Child into protective custody persisted. The court further found, by clear and convincing evidence, that it was in the best interest of the Child to terminate Father's parental rights. In its final judgment, entered July 18, 2013, the trial court delineated the following findings of fact and conclusions of law in pertinent part:

> [T]he Court finds that [Father] was incarcerated when this petition was filed and that, prior to his incarceration, [Father] engaged in conduct which exhibits a wanton disregard for the welfare of the child. The Court has very little

-4-

difficulty making that finding. [Father] was his son's sole custodian. He committed a violent criminal offense, knowing the likely consequences would be incarceration. He refused to make bond and failed to take any steps to ensure the child had an appropriate caretaker during his months of pre-trial incarceration. Then, when [he] was released prior to sentencing, he used drugs–both before a hearing in this Court and before a sentencing hearing–the Court doesn't think a parent's conduct can get any more wanton than that.

As to persistence of conditions, this child was removed from [Father's] custody because he had ignored his son's welfare and failed to make any arrangements for the child's care when he became unavailable. He engaged in magical thinking, believing that somebody would just step in and take care of Grayson; believing that a guilty plea would lead to automatic restoration of his son; and now believing that eligibility for parole in 18 months means he will walk out of prison in 18 months. This Court has heard all sorts of stories about parole and has sat in many of those meetings. Parole in 18 months is not a certainty and 18 months, in the life of a child, is not an early date. It's a long time. [Father] left this child without a suitable caregiver. He then made decisions that continued to leave the child without a suitable caregiver. That has not changed.

Upon those facts, the Court finds that the child has been removed by order of this Court for a period of six (6) months; the conditions which led to his removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of [Father]; there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to [Father] in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

[Conclusions of Law]

[Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. Due to his own conduct, he has not been able to maintain regular visitation or other contact with the child and any relationship that may once have existed has been extinguished by his absence. A change of caretakers and physical

-5-

environment is likely to have a detrimental effect on the child's emotional and psychological condition. [Father] has shown neglect and wanton disregard toward this child. He is currently incarcerated, without a healthy and safe physical environment to offer the child. Prior to his incarceration, he engaged in criminal activity and in such use of alcohol or controlled substances as may render [Father] consistently unable to care for the child in a safe and stable manner.

[Father] has been sentenced to a term of eight (8) years imprisonment. This child was barely two years old on the date of sentencing. The Court of [A]ppeals has previously held that "a parent who is incarcerated for a period of ten or more years when the child is eight years old or younger will be completely unavailable to care for the child for the majority of his childhood. For a child who is in foster care, failing to terminate the incarcerated parent's parental rights means that the child will spend his childhood in foster care, with no permanent home. . . Thus, for a child whose parent is incarcerated for ten years [or] more when the child is young, there need be no further evidence that substantial harm results to the child from that parent's total inability to care for him." *In Re: Marr,* [M2001-02890-COA-R3-CV], *2003 WL 152640* [at *12] *(Tenn.Ct.App., January 23, 2003).*[1] The circumstances of this case would result in a similar period of limbo for this child.

The mother's parental rights have been terminated by prior order of this Court.

The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

The child is entitled to a safe, secure and loving home. He is thriving and advanced in his development in the care of his foster parents. He has the opportunity to achieve permanency through adoption and he needs permanency now. He has moved enough through his short lifetime. The factors this court must consider are overwhelmingly in favor of termination and adoption.

It is, therefore, in the best interest of Grayson [H.] and the public that all of [Father's] parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of

---

[1]*In re Marr* was reversed on unrelated procedural grounds by *Osborn v. Marr*, 127 S.W.3d 737, 741 (Tenn. 2004) (declining to reach the merits of the action due to the petitioner's lack of standing).

Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption in loco parentis.

(Paragraph numbering omitted; emphasis in original.)

Acting through his trial counsel, Father timely appealed. Contemporaneously with the notice of appeal, Mr. Bennett moved to be allowed to withdraw from representation of Father, citing Father's stated lack of confidence in his representation at trial and a potential conflict of interest if Father were to argue ineffective assistance of counsel on appeal. The trial court allowed Mr. Bennett to withdraw and subsequently appointed Father's appellate counsel.

## II. Issues Presented

On appeal, Father presents two issues, which we have restated as follows:

1.      Whether the trial court erred by denying Father a continuance during trial.

2.      Whether Father received such ineffective assistance of counsel during the proceeding to terminate his parental rights as to constitute denial of his right to counsel.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct.

App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).  As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence.  Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights.  *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).  Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts,  *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings.  *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV.  Denial of Motions for Continuance

Father contends that the trial court erred by not granting him a continuance on July 11, 2013, for the trial set that day.  DCS contends that the trial court did not abuse its discretion in denying Father's motions for continuance, particularly considering the previous continuances granted to Father in the instant action and the Child's high-priority right to completing a termination of parental rights proceeding without unnecessary delay.  We agree with DCS.

"The granting or denial of a motion for continuance lies in the sound discretion of the court.  The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance."  *In re Zacharias T.M.*, 403 S.W.3d 212, 224 (Tenn. Ct. App. 2012) (quoting *Tenn. Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008) (in turn quoting *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997))).  Our Supreme Court has explained that a "trial court abuses its discretion only when it applie[s] an incorrect legal standard, or reach[es] a decision which

is against logic or reasoning that cause[s] an injustice to the party complaining." *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). As relevant to this issue, Tennessee Code Annotated § 36-1-124 (2010) provides:

> (a) In all cases where the termination of parental rights or adoption of a child is contested by any person or agency, the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4, and 6.

> . . .

> (c) It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

At the beginning of trial in the instant action, the trial court addressed the reasons for Father's absence and for the court's grant of Father's request to participate telephonically, stating:

> This is an unusual set of facts in that an order of transportation was signed to arrange to bring the father to court. After that order was signed, the father declined to come to court and asked this Court through his attorney to stop the transportation. It's well known to this Court and well known to the various participants here that when a person in prison leaves and goes somewhere else, he stops accruing what is known as good time. And good time gets you credit to get out a little earlier than you would if you didn't have good time.

> When a person has to travel from Northwest Correctional Complex in Tiptonville, Tennessee to Knoxville, they don't just lose the day, they might travel two or three days to court and then they sit in court, have their hearing

and then they go back to Maloneyville Road and they wait on the next transport going that way. It could be a day, it could be a week, so it could be several days that [Father] would have lost by coming to court. I'm trying to lay this out very carefully for the record because I expect we might need it.

Now, [Father]'s attorney has asked this Court to attempt to contact [Father] by telephone for the purpose of allowing him to participate in this hearing. Sometimes we're successful, sometimes we're not. But we're going to have this hearing in just a minute whether we're able to reach [Father] or not. I want all of that on the record.

Any objection to what I've put on the record thus far? Does that seem accurate, Mr. Bennett?

| Mr. Bennett: | Your Honor, may I make a proffer of fact – |
| The Court: | Yes. |
| Mr. Bennett: | –as it related to his transport? |
| The Court: | Yes. |
| Mr. Bennett: | My understanding is that it dealt with more than just good time. [Father] has a job while he's in prison, that if he were to be transported and miss too many days of that job through the transport, he would lose the job. |
| The Court: | I understand. |
| Mr. Bennett: | His parole requires that he have the job. And so, in essence, via transport, he was risking his very opportunity for parole. |
| The Court: | I understand your client's position and I understand the need of the children in this Court to have timely hearings and establish permanency and I'll balance those two interests as best I can through the remainder of this proceeding. |

The transcript indicates that the trial court reached Father by telephone upon its first attempt. Father participated in the proceeding by speaker phone. The following exchange then occurred:

| The Court: | We attempted to transport you and were notified by your attorney that you did not wish to be transported, so we stopped the transport at your request; is that correct? |
| [Father]: | Yeah, that's correct. |

-10-

| | |
|---|---|
| The Court: | All right. And we made it available to you – |
| [Father]: | Exactly – it didn't exactly work the way it was supposed to. He put in to stop the transport a month or so ago and they actually transported me halfway to Knoxville Tuesday, during which time they lost some of my property which included all of the stuff I had researched in the law library for this case today. |
| The Court: | Well, we got you back where your – we got you back where you wanted to go. I did the best I could. I received the order at 8:00 that morning and I acted on it very quickly. That's all I can tell you. |
| [Father]: | At this time, though, due to the fact that they lost my property which, you know, included what I built up for this case, I'm not prepared to go forward today. |
| The Court: | All right. You've made your record and the Court respectfully, is going to inform you we're going forward anyway. |

Father moved a second time for a continuance after interrupting direct examination of DCS's first witness. Father expressed his concern, to be addressed in a subsequent section of this opinion, that his appointed counsel was not adequately prepared for trial. As pertinent to Father's second oral motion for continuance, the following exchange occurred:

| | |
|---|---|
| [Father]: | Okay. This next question I have for Your Honor, will make the decision for me immediately. If I choose to try and acquire my own private counsel, pay for them, will I be granted that opportunity and given a continuance? Because if that's not going to be granted to me, then I see no point in attempting it. However if you will grant me that opportunity and you give me adequate time to do so, then I feel that I would very much like that chance. |
| The Court: | Let's review the procedural history in this case before I rule on that motion for a continuance and I'll treat it as an oral motion for continuance.<br>This case was originally set when, does anybody know? |
| [DCS Counsel]: | It was filed on October 17th of 2012, Your Honor. |
| The Court: | October 17th, 2012. |
| [DCS Counsel]: | And it was set for the first time on December 18th of 2012. |
| The Court: | It was set then on December 18th, 2012. |

| | |
|---|---|
| [DCS Counsel]: | There was an application for counsel and a contested trial date and this is the third trial date. |
| The Court: | All right. When was the first one? |
| [DCS Counsel]: | I'm not sure I have that information. |
| The Court: | The first trial wasn't held because the respondent prisoner wasn't transported; is that correct? |
| [DCS Counsel]: | That's correct, Your Honor. |
| The Court: | That was the second setting. |
| [DCS Counsel]: | I think that was both settings, Your Honor. |
| The Court: | Both settings. |
| [DCS Counsel]: | Right. |
| The Court: | So he was not transported. So then he was arranged to be transported for this setting and he cancelled his transport after it had begun. |
| [DCS Counsel]: | That's correct. |
| The Court: | The first was March 26th of 2013, and the next setting was April 23rd of 2013, and now we're into July and he's cancelled his – he's effectively, through his attorney, has cancelled his order of transport and wishes to participate by phone. Now he wishes to have a continuance to retain his own counsel, yet he didn't offer any objection to Mr. Bennett in March or April. Now that we're down to it, he offers an objection to Mr. Bennett's service, I'm not going to grant – |
| [Father]: | I didn't have an option to object in March or April, Your Honor. |
| The Court: | We have a writing from you. |
| [Father]: | I'm sorry, what? |
| The Court: | We have writings from you where you answered and asked for an attorney. There's no other correspondence from the Courts since that initial, so I'm denying your request for a continuance. |
| | Now, do you want Mr. Bennett to continue or do you want to go without an attorney? |
| [Father]: | No, we'll continue on then, Your Honor. |

Pursuant to Tennessee Rule of Juvenile Procedure 17(b), a juvenile court may direct a case to be continued "[u]pon good cause being shown." Father argues that considering his position as an inmate housed in West Tennessee, he submitted his request "as soon as practical," pursuant to the applicable local rule. *See* Knox County Juv. Ct. Local R. 10 ("All

Motions for Continuance shall be made as soon as practical before the trial date and must be approved by the Court."). He further argues that the trial court "summarily dismissed" his concerns regarding unpreparedness for trial and insufficient representation without proper consideration or explanation. We disagree.

The trial court in the instant action had previously granted two continuances, one in April 2013 and one in May 2013, due to difficulties in arranging Father's transportation from a prison facility in West Tennessee to the Knox County court. For the date of trial on July 11, 2013, Father's transportation was successfully arranged but was aborted at Father's request. Although Father's counsel presented reasons for Father's decision not to be transported as concern regarding missed good-time credit and prison employment, Father later testified during trial that his only reason for cancelling the transportation was his concern that he would not be able to emotionally withstand seeing the Child taken from him during a court hearing. The trial court granted Father's motion to participate telephonically. The transcript demonstrates that the court afforded Father ample opportunity to be heard and positioned other witnesses in the courtroom so that Father could hear them.

As the trial court noted, it was confronted with the task of balancing Father's requests for a continuance against the Child's paramount need for expedited proceedings and permanency of placement. *See* Tenn. Code Ann. § 36-1-124(c); *In re Zacharias T.M.*, 403 S.W.3d at 225 (concluding that the trial court did not abuse its discretion by denying the mother's motion for continuance when the mother failed to produce documentation of a medical emergency that she claimed prevented her from appearing, particularly considering "our General Assembly's clear directive regarding expediting contested parental termination proceedings"). Moreover, Father has failed to prove prejudice to his case due to the denial of a continuance. *See In re Zacharias T.M.*, 403 S.W.3d at 224-25. We find it difficult to envision how Father's cause could have been furthered by the legal research he claimed to have lost during the aborted transportation attempt. As we will address more fully in a subsequent section of this opinion, the evidence also does not support Father's assertion that his case was prejudiced by his appointed counsel's representation. The undisputed facts of this case support the trial court's finding, by clear and convincing evidence, that Father abandoned the Child by showing wanton disregard for the Child's welfare when Father committed acts that led to his incarceration and when he subsequently failed to provide for the Child's safety and stability during that incarceration. Father is not entitled to relief on this issue.

V. Ineffective Assistance of Counsel Claim

Father contends that he received such ineffective assistance of counsel at the trial court level as to constitute a denial of his right to counsel. While the right to counsel in a

parental rights termination proceeding is provided by Tennessee Rule of Juvenile Procedure 39(e)(2), there is no controlling precedent for this Court to recognize ineffective assistance of counsel as a theory for relief in such a proceeding. *See In re S.D.*, No. M2003-02672-COA-R3-PT, 2005 WL 831595 at *15 (Tenn. Ct. App. Apr. 8, 2005) (explaining that Tennessee appellate courts "are not required to determine whether due process requires not just appointment of counsel in termination cases, but effective performance of counsel."). We conclude that the instant action is not an appropriate one for consideration of establishing a protected right to effective assistance of counsel in parental rights termination cases.

"Under the United States Constitution, parents do not have an absolute right to counsel in termination of parental rights proceedings." *In the Matter of Valle*, 31 S.W.3d 566, 571 (Tenn. Ct. App. 2000) (citing *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 18 (1981)). Noting, however, that a parent's interest "'undeniably warrants deference, and, absent a powerful countervailing interest, protection,'" the United States Supreme Court in *Lassiter* described a balancing test to be considered when a court assesses the risk of such a proceeding violating a parent's due process rights if the parent is not represented by counsel. *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *see also State ex rel. T.H. by H.H. v. Min*, 802 S.W.2d 625, 626 (Tenn. Ct. App. 1990) ("[T]he parental right to raise one's children is a fundamental liberty protected by the due process clause of the fourteenth amendment.").

In 1984, the Tennessee Supreme Court and General Assembly adopted the Tennessee Rules of Juvenile Procedure, providing what this Court has held to be "minimum requirements which the trial court must follow when a parent appears at a termination hearing without an attorney." *See In the Matter of Valle*, 31 S.W.3d at 572 (quoting *State, Dep't of Human Servs. v. Taylor*, No. 03A01-9609-JV-00286, 1997 WL 122242 (Tenn. Ct. App. Mar. 19. 1997)). Pursuant to Tennessee Rule of Juvenile Procedure 39(e)(2), the trial court must inform any party to a parental rights termination proceeding who appears at an adjudicatory hearing without counsel of that party's right to counsel and in the case of an indigent respondent, the right to court-appointed counsel. In addition, to proceed at trial, the petitioning party must affirmatively show that an incarcerated parent or guardian has received notice that a court-appointed attorney will be provided if the parent or guardian is indigent. Tenn. R. Juv. P. 39(b)(2)(D)(i).

In the case at bar, Father was appointed attorney Bennett upon Father's request for counsel submitted to the trial court in December 2012. Father acknowledges that Mr. Bennett contacted him at least twice in preparation for trial and worked with him to acquire and subsequently cancel, at Father's request, transportation from prison to the parental rights termination proceeding. To support his position that he should receive relief for ineffective assistance of counsel, Father notes that he voiced misgivings at trial about his counsel's

representation and attempted to have Mr. Bennett relieved early in the proceedings that day. Subsequent to the trial court's denial of Father's first oral motion for continuance and a few minutes into DCS's direct examination of its first witness, the following exchange occurred:

| | |
|---|---|
| [Father]: | Your Honor, sir? |
| The Court: | Yes. I'm a little uncomfortable with you talking to me. What I would like for you to do if you want to speak is say I have something I need to say, have my attorney come to the phone. |
| [Father]: | That's what I was about to ask is how do I confer with my attorney? |
| The Court: | Right now, I'm going to let you. |
| [DCS Counsel]: | Do you want us to leave? |
| The Court: | No, you're not going to leave. He's the one that chose to have this this way. So he's going to have to live with the consequences. I can't keep cutting you off and redialing and putting you on – it's too difficult a procedure to get you back. So go ahead. |
| Mr. Bennett: | [Father]? |
| [Father]: | Yes. |
| Mr. Bennett: | Is it something you can tell me in open court? |
| [Father]: | I'm sorry, what? |
| Mr. Bennett: | Is this something you can discuss with me in open court? |
| [Father]: | I prefer not to. |
| The Court: | Then you're not going to get to discuss it then. We've only got you on one phone line, it's a speaker phone and, you know, have at it, [Father]. You're the one wanting to do it this way, you've got to live with the limitations. |
| [Father]: | Then I guess we can discuss in open court. Mr. Bennett, I prefer – I hope you do not take offense to this, it's not how I intend it, but I wanted to know if there's a way to – I can't believe I'm saying this, but relieve you as my counsel and perhaps try and acquire another attorney, because I just honestly feel that you've not represented my best interest up to this point. We've spoke twice not about the case whatsoever. I have – you know, I just don't feel like I'm being adequately represented. This is very, very important to me. This is my son. He means the world to me and I can't not voice this, is what I'm trying to get at. |

-15-

| | |
|---|---|
| Mr. Bennett: | That is a matter you probably need to address in open court and the judge heard what you said and it will be his decision. |
| [Father]: | We have – |
| The Court: | Hold on a minute. |
| [Father]: | – no witnesses, there's nobody that I can call, there's nothing. It's just me sitting here and you objecting when you feel the need to object, but I don't think you know very much about the situation or the case and given what's at stake here, I feel that I need someone that's more prepared. |
| The Court: | Here are your choices, sir. You can go with Mr. Bennett, you can represent yourself. You can ask this Court to grant you a continuance so you can hire a private counsel and I can rule on that, but if you get rid of Mr. Bennett, you will not be appointed another counsel by this Court. Do you understand? |
| [Father]: | Okay. |
| The Court: | That's your choices. So you decide what you want to do. If you want to ask me for a continuance, I'll rule on that. You can tell me why on the record and I'll do everything I can to protect your rights on appeal. So if you want to ask for a continuance so that you can retain counsel, I'll consider that request. |
| [Father]: | Okay. Your Honor, my next question to you would be if by some means I cannot find counsel that, you know, that I can afford, what happens then? Does it fall back on me representing myself? |
| The Court: | I have given you in the Court's eyes, very competent, very experienced counsel. He's handled dozens of these cases, has appeared in the Court of Appeals, appeared in this Court many times with varying degrees of success, has represented his clients zealously and admirably. Mr. Bennett lives in Knoxville – |
| Mr. Bennett: | Sevier County. |
| The Court: | Sevier County, I'm sorry, and you are placed very far away. And if he's contacted you twice in preparation for this without getting into specifics, the Court is satisfied with that. So you can either go with Mr. Bennett or make a motion that you wish to hire your own counsel and I'll |

consider that, or you can go alone. You may not get your motion to continue granted. You haven't made one, it's not before the Court.

As noted previously, Father elected to continue with Mr. Bennett as counsel. A few minutes following the above exchange and before cross-examination of DCS's first witness was completed, the trial court allowed Father approximately five minutes to consult privately with Mr. Bennett while all others, including the trial judge, left the courtroom. Mr. Bennett continued to represent Father throughout the proceedings, and from all indications in the record, he did so zealously. Counsel then filed a timely notice of appeal on Father's behalf contemporaneously with his motion for withdrawal of representation.

In support of his argument that this Court should consider the theory of ineffective assistance of counsel, Father relies on *In re M.E.,* No. M2003-00859-COA-R3-PT, 2004 WL1838179 (Tenn. Ct. App. Aug. 16, 2004). This Court reversed the termination of the father's parental rights in *In re M.E.* upon determining that the trial court had erred by failing to appoint substitute counsel to represent the father after his retained counsel "disappeared." *Id.* at 15. The father in *In re M.E.* attempted to retain counsel, but his retained counsel appeared for only slightly more than two days out of six full days of trial and left the father without representation for "major aspects of the trial," including testimony of the children, the children's mother, and the father himself, as well as such key facets of representation as closing arguments. *Id.* at 14-15. As DCS notes, *In re M.E.*, did not establish a theory of ineffective assistance of counsel in parental rights termination cases in Tennessee. Instead, this Court determined that the essential disappearance of the father's retained counsel in that case was equivalent to no counsel at all. *Id.* at 15 ("The foregoing analysis of the performance, or lack thereof, of Father's attorney reveals that it was so inadequate it was equivalent to Father having no attorney.").

The facts surrounding Mr. Bennett's representation of Father in the instant action are highly distinguishable from those in *In re M.E.* Upon our thorough review of the record, we find no indication that Father was provided with ineffective assistance of counsel. We accordingly find no evidence in the record that Father's case was prejudiced by the trial court's denial of Father's request to substitute counsel. Father is not entitled to relief on this issue.

VI. Grounds for Termination of Parental Rights and Best Interest of the Child

Father does not raise as issues on appeal the grounds upon which the trial court terminated his parental rights or the court's finding that termination of those rights was in the best interest of the Child. Because of the significance of these issues, however, we have

considered them on appeal. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010). The trial court terminated Father's parental rights on the statutory grounds of (1) abandonment by wanton disregard for the welfare of the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(1), and (2) persistence of conditions that led to the Child's removal into protective custody, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

Tennessee Code Annotated § 36-1-113(g)(1) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

   (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) defines abandonment, in relevant part, as:

        (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, *or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child*; . . .

(Emphasis added.)

Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

        (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that,

-18-

therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

When at least one ground for termination of parental rights has been established, the petitioners must then prove, by clear and convincing evidence, that termination of the parent's rights is in the Child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877.

Following our careful and thorough review of the record, we conclude that there is clear and convincing evidence to support the trial court's findings that grounds to terminate Father's parental rights exist pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and (3). We further conclude that the record contains clear and convincing evidence that termination was in the Child's best interest. We therefore affirm the trial court's termination of Father's parental rights.

## VII. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to the appellant, Steven H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE